Filed 1/6/22  P. v. Rivera CA4/2
Opinion following court's order to vacate prior opinion
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

> **California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075838 |
| v. | (Super.Ct.No. FVI800549) |
| CHRISTOPHER SHANE RIVERA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Michael B. Harris, Judge.  (Retired judge of the San Diego Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Spolin Law, Aaron Spolin and Caitlin Dukes for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Alan L. Amann and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

1

**FACTUAL AND PROCEDURAL HISTORY**

A.    PROCEDURAL HISTORY

On October 6, 2010, a jury convicted defendant and appellant Christopher Shane Rivera of first degree murder under Penal Code[1] section 187, subdivision (a) (count 1); attempted robbery as a lesser included offense of robbery under sections 664 and 211 (count 2); and first degree residential burglary under section 459 (count 3). With respect to all three counts, the jury found a principle was armed with a firearm, but found not true the allegations that defendant personally discharged a firearm. The trial court sentenced defendant to an indeterminate term of 25 years to life for the murder, and eight years for the attempted robbery and burglary.

After defendant appealed, we affirmed the judgment. (*People v. Rivera* (Apr. 18, 2012, E052339) [nonpub. opn].)

On January 2, 2019, defense counsel filed a petition for resentencing under section 1170.95. The People stipulated to the fact that defendant stated a prima facie case for an order to show cause and an evidentiary hearing because of the jury's not true finding on the personal gun use allegation.

The trial court conducted an evidentiary hearing. Following briefing by the parties and a review of the underlying trial transcripts and argument, on August 10, 2020, the trial court found defendant ineligible for resentencing because he was a major participant in the felony murder and acted with reckless disregard for human life.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

On September 28, 2020, defendant filed a timely notice of appeal.

B.     FACTUAL HISTORY[2]

"On the evening of March 6, 2008, Lucas Buckingham was partying in his apartment with the murder victim, Atencio, Atencio's brother Andrew, and a friend of Andrew's. They were drinking and doing drugs. They went to sleep between 2:00 a.m. and 4:00 a.m. Atencio slept on the living room couch. Andrew and his friend left the apartment between 7:30 a.m. and 8:00 a.m. At that time, Atencio was in the living room talking on the telephone with his fiancé.

"Later that day, Troy Fava, Peter Lewis, Charles Carr, and defendant arrived at Buckingham's apartment complex in two cars. Fava and Lewis were in one car and defendant and Carr were in defendant's sister's BMW. After exiting their vehicles they walked through the complex to Buckingham's apartment. They entered through an already open front door.

"Carr testified that at the time of entry, Atencio was seated on the living room couch. He testified that defendant, Fava, and Lewis went into Buckingham's bedroom, and he remained at the doorway to the apartment. Defendant testified that as they walked in, Atencio stood up and asked, '[w]hat's going on?;' after being asked where Buckingham was, one of the group pushed Atencio into a chair.

---

[2] The facts are taken from the unpublished opinion in case No. E052339.

3

"Buckingham testified that after going to sleep in the early morning hours, the next thing he remembered was that it was daylight and Fava was straddling him on the bed and punching him. Buckingham indicated that Lewis was behind Fava and there was another person in the doorway he did not recognize. Fava then pulled him to the floor and continued punching him while Lewis was holding a black semiautomatic pistol. After Fava stopped beating Buckingham, Lewis asked where the stash was; Fava indicated to Lewis that that was not what they were there for, and that they needed to do what they came to do. Lewis then put down the gun, took his gloves off, and started to choke Buckingham.

"Defendant testified that after entering the apartment, he and Fava went to Buckingham's bedroom and Carr and Lewis remained in the front room with Atencio. As Fava was beating Buckingham, defendant stood at the door. In a statement to an investigating officer, defendant indicated it was he who asked Buckingham where the money and drugs were. He further testified that at some point Lewis entered the room and started beating on Buckingham.

"Buckingham testified that as he was being choked by Lewis, things began to go fuzzy. He then heard from the living room a large thud, which was followed by gunshots. Looking from his bedroom he could see Lewis standing in the area where the carpet joins the kitchen linoleum, shooting a firearm. Lewis was facing the front door. Two guns were being fired. He believes he heard approximately 15 gunshots. He then heard Fava say, '[w]e've got to leave now,' and they left the apartment.

4

"Carr testified that as he was standing at the door to the apartment he heard sounds of fighting coming from the bedroom. During this time, Atencio got off the couch and went towards the hallway leading to the bedroom; as Atencio turned, Carr saw a gun in Atencio's right hand. Carr immediately ran from the apartment. As he was running he heard about 10 shots being fired. Defendant testified that as Lewis was beating up Buckingham he heard a commotion in the living room. He then saw Atencio moving towards the living room with a gun. Defendant went back into the bedroom and got on the floor; at this point, gunshots started; after they stopped, he ran outside.

"Buckingham indicated that after the shooting stopped he went outside; Atencio was lying on the ground bleeding with a bullet in his chest. Atencio was breathing at that point. After Buckingham called 911, he watched Atencio die. He did not see any firearms in the vicinity of Atencio.

"After leaving the apartment, defendant ran to his car. As he was leaving the apartment complex he stopped to pick up Carr. Carr testified they drove to Carr's house. When they got there, defendant pulled two guns from his jacket and indicated that he needed to do something with them. Defendant told Carr that Atencio would not stop shooting and that he had to shoot back. He indicated he did not know how many times he fired and that he just hung the gun around the corner and fired. He was unsure if he shot Atencio. Defendant told Carr that as he was leaving the apartment Atencio was lying on the ground and still moving; defendant picked up a gun lying near Atencio.

5

"Carr further testified that after going to defendant's house they drove into the desert and hid the guns in some rocks. At the time of the incident, Steven Pennington was on homicide detail with the San Bernardino County Sheriff's Department. He testified that he interviewed Carr in the early morning hours of March 8. Carr pointed out the area where the guns were hidden. He located a Glock model 22 and a Sig P226.

"William Matty, a criminalist with the State of California Department of Justice, testified that he examined a Glock model 22 and a Sig Sauer nine-millimeter. Three of the cartridges collected at the apartment were fired by the Glock pistol. Two other cartridges were fired by the Sig Sauer pistol. The two bullets retrieved during the autopsy could not have been fired by the Glock, but could have been fired by the Sig Sauer. The Sig Sauer was owned by William Rivera, defendant's father.

"Hazel Whitworth, a criminalist with the sheriff's crime laboratory, testified that Atencio had gunshot wounds to the chest area. He was somewhere in the entryway of the apartment when a bullet hit him in the heart. Dr. Chanikarn Changsri, a deputy medical examiner with the San Bernardino County Sheriff's Coroner's Division, indicated that the cause of Atencio's death was a bullet that penetrated between the ribs and went into the heart.

"The defense was premised on the notion that Carr was the shooter. Defendant's father testified that on the day before the shooting he was going to take his Sig Sauer pistol to the shooting range. Prior to going, he took the gun (in its case) from his safe and put it in his pickup truck. Thereafter, and at the behest of his wife, he agreed to go to San Diego for the weekend. As they were packing to leave for San Diego, he noticed the gun

6

case in his pickup; rather than take it back into the house, he placed it on the rear floorboard of his daughter's BMW. Defendant testified he did not know of the presence of the gun. On the morning of the shooting, he drove his sister's BMW and picked up Carr; the two of them went to Fava's house. Lewis was at Fava's house. The rag top on the BMW was down. Carr and others had access to the inside of the car during the period of time they were at Fava's house.

"Defendant testified that as he was leaving the apartment after the shooting he passed by Atencio; there were no objects on the ground around the victim. As he was leaving the complex in his car, he picked up Carr. When they arrived at Carr's house, and while defendant was on the telephone with Fava's sister, he noticed that Carr had a gun on his lap. Thereafter, Carr pulled another gun from a pocket of his hoodie. Shortly thereafter they went into the desert and Carr hid the guns in a rock pile." (*People v. Rivera*, *supra*, E052339.)

## DISCUSSION

A.      THE TRIAL COURT PROPERLY FOUND DEFENDANT INELIGIBLE FOR RELIEF UNDER SECTION 1170.95[3]

In this case, the trial court denied defendant's petition at the final stage of review, finding beyond a reasonable doubt after a hearing pursuant to section 1170.95,

---

[3] We are aware of the Supreme Court's recent opinion in *People v. Lewis* (2021) 11 Cal.5th 952 (*Lewis*), addressing the appropriate stage in section 1170.95 proceedings for appointment of counsel. This is not an issue in this case because the trial court appointed counsel for defendant, the parties briefed the petition, and the trial court held a hearing to determine whether defendant made a prima facie case for relief.

subdivision (d)(1), that defendant was ineligible for resentencing because he was a major participant and acted with reckless indifference to human life. Defendant contends that the trial court erred in finding him ineligible for relief because there was insufficient evidence that he was a major participant in the underlying robbery and burglary, and that he acted with reckless indifference to human life. For the reasons set forth *post*, we find that the trial court properly found defendant ineligible for relief under section 1170.95.

            1.     *ADDITIONAL FACTS FROM THE SECTION 1170.95 HEARING*

Here, at the section 1170.95 hearing, the parties relied on the record of conviction and did not introduce additional evidence. In addition, the parties provided extensive briefing.

The prosecutor primarily relied on defendant's statements to Detective Gaffney during defendant's police interview, which was admitted at trial as Exhibits 79 (the video of the interview) and 79a[4] (the transcript of the interview). The prosecutor argued that defendant's own statements reflected his major role in planning the assault and robbery of Buckingham, which led to the death of Atencio. Defendant was aware of the escalating violence between Fava, Lewis and Buckingham because Fava and Lewis told defendant about their recent encounter wherein they assaulted and robbed Buckingham. Moreover, defendant participated in a second incident that involved Buckingham wherein defendant and two of his cohorts tried to assault Buckingham. Buckingham, however,

---

[4] Exhibit 79a from the underlying trial is part of the clerk's transcript from the trial at pages 554 through 611. The People attached a copy of the interview as Exhibit 5 in its pleadings in the clerk's transcript on this appeal at pages 221 through 277.

escaped by brandishing a weapon and driving away. Buckingham damaged defendant's car while escaping.

The prosecutor stated: "So repeatedly during the conversation with Sergeant Gaffney [defendant] refers to what the plan was before going over to Buckingham's apartment and it is consistent, although he uses different language, consistently the plan is to both assault and take his stuff, and it is clear from the statements that [defendant] knew what was going to go down and voluntarily agreed to be a part of it, and in one of these he specifically mentions that he wanted to go over there because 'I need money. He needs to pay for that bumper.' So he had an individual reason for going over as well."

The prosecutor also recounted that on the day of the murder, defendant met with Fava and Lewis before going to Buckingham's. They discussed how Fava and Lewis were going to "Fuck up" and "hurt" Buckingham, while defendant intended to rob Buckingham. Defendant was not only aware that Buckingham possessed guns but he also knew that Lewis always carried a gun and that their confrontations were escalating.

Additionally, the prosecutor pointed out that defendant took the gun actually used to kill Atencio. The gun, a Sig Sauer, was registered to defendant's father.

Furthermore, the prosecutor observed that defendant, during his interview, admitted that he, Fava and Lewis entered Buckingham's apartment without invitation. Defendant then watched as Fava and Lewis pushed Atencio down on a chair, and that defendant entered Buckingham's bedroom with his cohorts while Buckingham was asleep. Defendant watched as his companions beat and strangled Buckingham to the point that Buckingham thought he was going to die. Defendant used that as an

opportunity to try and rob Buckingham. Defendant was also placed in the vicinity of the shooter, based on ballistics and defendant's own testimony. Defendant did not stop the shooting, render aid or call police. He admitted that his main focus was to flee the scene.

The prosecutor stated: "Whether the defendant's own actions or inactions played a role in the death. Here we have strength in numbers. Four people who went over to participate in a home invasion robbery. [Atencio] was significantly out numbered. [Atencio] used Buckingham's firearm in a attempt to [repel] the home invasion robbers. [Defendant] chose to go with the other three to the apartment. He chose to park in the same area as Peter Lewis where there was an escape advantage on the other side of the complex. He chose to make entry without invitation into the bedroom. He chose to stand in the doorway while Fava and Lewis beat up Lucas Buckingham. He chose to look for items of value while beating him up, and he chose to remain and do these things even when he could no longer plausibly say, I thought we were going over there to talk. [¶] . . . [¶] Whether the defendant acted in a particular way after lethal force was used, he ran out of the apartment, ran past the victim, victim's on the group, he's moving, he's still alive, which [defendant] admits. He didn't stop to help [Atencio]. He didn't call the police. He specifically said he didn't want to be involved with the police. He knew there was just a gun battle. [¶] He specifically said that his main focus was getting away, fleeing the scene, . . . and he says he didn't call 911. Wasn't thinking about, maybe an ambulance needing to respond. So those are the factors with regard to major participant."

10

The prosecutor then moved on to defendant's reckless disregard for human life during the commission of the crimes. The prosecutor noted the overlaps between participating and reckless disregard—"there's a lot of overlap but knowledge of weapons is one, use and number of weapons is one, proximity to the crime and opportunity to stop the killing or aid the victim, duration of the conduct whether the murder came at the end of a prolonged period, restraint of the victims by the defendant, awareness of the defendant that his or her confederate was likely to kill, and the defendant's efforts to minimize the possibility of violence during the crime."

The prosecutor reiterated that the gunfire occurred after a prolonged period of restraint of the victims by defendant and his cohorts, not mere seconds but minutes. The prosecutor also emphasized that defendant made no effort to render aid to Atencio. The prosecutor, therefore, concluded that a jury could look at the factors and find beyond a reasonable doubt that defendant was guilty of felony murder under the new definition, which required defendant to be a major participant in the felony, who acted with reckless disregard for human life.

At the hearing on the motion, defense counsel argued that defendant was neither a major participant nor acted with reckless disregard for human life. Counsel relied on defendant's trial testimony. He argued that defendant was only vaguely aware of the initial incident involving Buckingham and that in the second confrontation, his cohorts only relayed Buckingham's brandishing of a gun during their 20-minute pursuit. Defense counsel reasoned that the second incident supported defendant's claim that his motive in going to Buckingham's was to collect money to repair his car. Defendant denied

11

knowing that his father's gun was in his sister's car. His father testified that he had unexpectedly placed the gun in his daughter's car; defendant drove that car on the day of the murder. Defense counsel further pointed out that defendant testified they did not discuss firearms before the planned assault and robbery. Additionally, defendant did not fight anyone, and defendant testified that he hid in the bedroom when gunshots started to fire.

At the conclusion of the hearing, the trial court found that the prosecutor met his burden of proof. The court first addressed the notion that the day of the murder involved a regular robbery—the court found that it did not. The court relied on the "language that we've discussed" to find violence was contemplated, not just robbery.

Second, the court then found evidence of planning among defendant and his cohorts because they had different motives for going to Buckingham's, and had discussed them in advance. The court stated, "Well that necessarily implies that there was some type of conversation, for one person to know of the other person's motive."

Third, the court concluded that defendant had knowledge that his father's gun was in the car and found contrary testimony not credible. The court also noted it was unreasonable to conclude that defendant and his cohorts never discussed firearms given their prior experience with Buckingham. The court then observed, "lo and behold there's a firearm that appears in the convertible." The court rejected as unreasonable that defendant did not know the gun was in his sister's car but his cohorts knew about the gun. The court went on to state that when defendant took the stand, "There was no reaction. . . . There was no reaction about finding that it was indeed his father's weapon,

12

how he recognized it, how it got back to either his sister's car or to [his father's] safe. So that whole version to me is unreasonable and I find that a jury would reject it. So as to major participant I do find that there's connection to the weapon."

Additionally, the trial court noted that there was evidence defendant went from room to room witnessing his cohorts carrying out different aspects of the crime. The court observed that defendant could be viewed as a ringleader. Furthermore, the trial court found that in addition to the planning and defendant's connection to the gun, the fact that defendant provided the transportation, which contained the gun, and his post-shooting behavior, established that defendant was a major participant beyond a reasonable doubt.

As to the reckless disregard for human life, the trial court found that the same circumstances establishing major participation established the reckless disregard for human life component as well. The court emphasized the fact that the "violence was planned . . . and you know that they are known to be strapped, you know that this is a likelihood for some type of violence." Defendant observed the violence, including strangulation. Moreover, even if defendant had a separate motive to get compensation for the damage to his mother's car, he knew that his cohorts planned "to F someone up who was strapped" as well. The trial court sated that the evidence "show[ed] a reckless indifference for human life and in the totality of the evidence I find that the People have met their burden of proof beyond a reasonable doubt and the petition for resentencing is denied."

2. *ANALYSIS*

Effective January 1, 2019, Senate Bill No. 1437 (Sen. No. 1437) was enacted to "amend the felony-murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) It accomplished this by amending section 188, which defines malice, to add a requirement that all principals to a murder must act with express or implied malice to be convicted of that crime. (Stats. 2018, ch. 1015, § 2, subd. (a).) It also amended section 189, which defines the degrees of murder, by adding a condition to the felony-murder rule. Henceforth, in order to be convicted of felony murder, a defendant who was neither the actual killer nor a direct aider and abettor to the murder must have been a major participant in the underlying felony who acted with reckless indifference to human life. (Stats. 2018, ch. 1015, § 3, subd. (d)(3); see *Lewis*, *supra*, 11 Cal.5th at pp. 959-960; *People v. Martinez* (2019) 31 Cal.App.5th 719, 723.)

"In addition to substantively amending sections 188 and 189 of the Penal Code, [Sen. No. 1437] added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis*, *supra*, 11 Cal.5th at p. 959.) Thus, section 1170.95 allows those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts." (§ 1170.95,

14

subd. (a).)  The section goes on to describe what must be included in a petition for resentencing, and sets forth the procedure to be followed by a trial court upon receiving such a petition.

In its initial review of whether a petitioner has made a threshold showing that he or she falls within the provisions of section 1170.95, the court examines whether the petitioner has stated eligibility for relief.  A petitioner must allege:  (1) an accusatory pleading was filed against him or her allowing prosecution under the felony-murder rule or the natural and probable consequences doctrine (§ 1170.95, subd. (a)(1)); (2) he or she was convicted of first or second degree murder following a trial, or pleaded guilty to first or second degree murder in lieu of a trial at which he could have been so convicted (*id.*, subd. (a)(2)); and (3) he or she could not today be convicted of first or second degree murder because of the 2019 amendments to sections 188 and 189 (*id.*, subd. (a)(3)).

If the petitioner meets this facial showing of eligibility, the court must appoint counsel and entertain briefing from the prosecutor and appointed counsel.  If, after briefing, the petitioner has established a prima facie case he or she is entitled to relief, i.e., if a *showing* regarding his or her eligibility has been made, the court must issue an order to show cause, and thereafter hold a full hearing to determine whether petitioner is entitled to relief.  (§ 1170.95, subds. (c) & (d)(1); see also *Lewis*, *supra*, 11 Cal.5th at pp. 959-960.)  "If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner

15

had not . . . previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' [Citation.] 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' [Citation.] At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (*Lewis*, at p. 960.)

To be eligible for resentencing, defendant must show that he "could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective" in Sen. No. 1437. (§ 1170.95, subd. (a)(3).) As we have described *ante*, Sen. No. 1437 amended section 189 to require, in all felony-murder cases, proof that the defendant was the actual killer, acted with the intent to kill, or "was a major participant in the underlying felony and acted with reckless indifference to human life." (§ 189, subd. (e)(3); see *People v. Gentile* (2020) 10 Cal.5th 830, 841-843.)

At the final eligibility hearing, the prosecution must "prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3); see also *Lewis*, *supra*, 11 Cal.5th 952, 960.)

We recognize that there is currently a split in authority on what legal standard a trial court should apply at a section 1170.95, subdivision (d) hearing. In *People v. Duke* (2020) 55 Cal.App.5th 113, 123 (review granted Jan. 13, 2021, S265309) Division One of the Second District Court of Appeal concluded the applicable standard is akin to substantial evidence review. That is, "[t]o carry its burden, the prosecution must . . . prove beyond a reasonable doubt that the defendant *could* still have been convicted of

16

murder under the new law—in other words, that a reasonable jury could find the defendant guilty of murder with the requisite mental state for that degree of murder. This is essentially identical to the standard of substantial evidence." (*Id.* at p. 123.)

Division Two of the Second District Court of Appeal, however, rejected this view in *People v. Fortman* (2021) 64 Cal.App.5th 217, review granted July 21, 2021, S269228. There, the court held "that, at the hearing contemplated by section 1170.95, subdivision (d), the People are required to prove *to the trial court* beyond a reasonable doubt that the petitioner is guilty of murder on a theory of murder valid after [Sen. No.] 1437's enactment." (*Id.* at p. 226; see *People v. Lopez* (2020) 56 Cal.App.5th 936, 949 (*Lopez*), review granted Feb. 10, 2021, S265974; *People v. Duchine* (2021) 60 Cal.App.5th 798, 814 ["idea that the prosecution must prove beyond a reasonable doubt that there is substantial evidence in a prior record to support a hypothetical finding of guilt on a theory of murder that may never have been presented to a jury is beyond" incomprehensible]; *People v. Clements* (2021) 60 Cal.App.5th 597, 617-618, review granted Apr. 28, 2021, S267624; *People v. Hernandez* (2020) 60 Cal.App.5th 94, 103; *People v. Rodriguez* (2020) 58 Cal.App.5th 227, 241-242, review granted Mar. 10, 2021, S266652.)

Our Supreme Court will resolve this split in *Duke*, but until it does, "we join the growing chorus that requires an independent finding by the trial court," and proof beyond a reasonable doubt by the People that the petitioner is ineligible for relief. (*People v. Fortman*, *supra*, 64 Cal.App.5th at p. 221.)

Although section 1170.95 establishes a multi-stage review process for the trial court to determine a defendant's eligibility, the statute does not indicate that, when we review the trial court, we should repeat the final stage of that process with no deference to the trial court's findings. We join the other courts that have considered this question in holding that it applies to the review of final eligibility hearings under section 1170.95 as well. (See *Lopez*, *supra*, 56 Cal.App.5th at pp. 953-954; *People v. Clements*, *supra*, 60 Cal.App.5th at p. 618.)

When reviewing for substantial evidence, " ' "the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*Lopez*, *supra*, 56 Cal.App.5th at p. 950.)

3. *SUBSTANTIAL EVIDENCE SUPPORT'S THE TRIAL COURT'S FINDING*

Under the substantial evidence standard of review, we find that substantial evidence supports the trial court's finding that defendant was a major participant who acted with reckless indifference to human life in the robbery/burglary.

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) the Supreme Court set out a series of factors relevant to determining whether a defendant's participation in a felony "was sufficiently significant to be considered 'major.' " (*Id*. at p. 803.) These factors are: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons?

18

What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Ibid.*, fn. omitted.)

After listing the relevant factors to determining whether a defendant was a major participant, the Supreme Court in *Banks* cautioned that "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.  All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death [citation] was sufficiently significant to be considered 'major.' " (*Banks*, *supra*, 61 Cal.4th at p. 803.)

Subsequently, in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the Supreme Court elaborated on the *Banks* case.  To determine whether a defendant exhibited a reckless indifference to human life, a court should look at:  the defendant's knowledge of weapons, including the use and number of weapons; the defendant's proximity to the crime and opportunity to stop the killing or aid the victim; the duration of the offensive conduct and "whether a murder came at the end of a prolonged period of restraint of the victims by defendant"; the defendant's awareness that his cohorts were likely to kill; and the defendant's efforts to minimize the possibility of violence during the crime.  (*Clark* at pp. 616-623.)

19

Applying the *Banks* and *Clark* factors, as the trial court did in this case, we find that substantial evidence supports the finding that defendant was a major participant in the burglary/robbery and that he acted with indifference to human life during the commission of the crimes.

### a. Defendant Was a Major Participant

First, substantial evidence supports the trial court's finding that defendant was closely involved with the planning and execution of the armed robbery/burglary. Defendant admitted to the detective during his interview that he was part of the plan to go to Buckingham's apartment to "fuck him up" and to rob him. He stated: "Um, pretty much, it was, we're gonna go over there and beat him up, take, take, take his stuff, ya know, ya know, try to hurt him"; "[t]hey were gonna fuck him up, ya know, I'll take some of the money that they take out of his pocket." Defendant even acknowledged that he knew Buckingham to be armed, generally, since he used to work in a gun store and was a drug dealer. Defendant also told the detective that Lewis always carried a gun.

Moreover, recently, there were two violent confrontations between Buckingham and some or all of the involved parties during which Buckingham was armed and the confrontations had escalated to include a threat by Buckingham to shoot Fava in the head. Additionally, defendant confirmed that he was aware of the first incident between Fava, Lewis and Buckingham. In that incident, Fava and Lewis had gone to Buckingham's to confront him over selling drugs to a friend's son and threatening to take her stuff to pay for his debt. The incident ended with Fava and Lewis assaulting Buckingham and taking drugs, money, and a gun. In response, Buckingham started calling and threatening Fava

20

and Fava's family if Fava did not return what he had stolen and pay Buckingham one thousand dollars.

A few weeks later, defendant admitted that he agreed to join the dispute on behalf of Fava and accompanied Lewis and Fava to beat up Buckingham for making his threats. The attack, however, was thwarted by Buckingham brandishing a gun, striking defendants car with his own car, and then driving away. Even though defendant observed Buckingham brandishing a gun at his companions, defendant pursued Buckingham in his (mother's) car.

The feud between the parties further escalated thereafter. Defendant stated that Buckingham called Fava after the car incident. Defendant overheard Buckingham say, "[Y]ou fucked up, dude, I'm gonna fucking, put a bullet fucking . . . right in your face." Fava's response was "like, well, come do it, dude, you know where I live, come do it."

The court found that the plan was no "garden variety armed robbery" given the plan to seriously hurt Buckingham. Moreover, as the evidence showed, the plan even contemplated death given the nature of the escalating conflict between the parties. The court noted that the shared and exchanged motives of defendant, Fava and Lewis led up to the robbery/burglary. This supported that defendant was involved in the planning of the robbery/burglary. Defendant made clear during his interview that he was also motivated to back Fava up in his attack on Buckingham in order to recover payment from Buckingham for the damage to defendant's mother's car. When Fava asked defendant if he wanted to go with Fava and Lewis, defendant stated, "well, fuck, d, ya know,

21

[Buckingham] needs to pay for that bumper, um, so sure I'll go with you guys or whatever."

The second *Banks* factor also supports the court's finding that defendant was a major participant in the crimes. The gun that was used to commit the murder was found in car that defendant drove. The gun belonged to defendant's father. Based on the totality of the circumstances, the trial court reasonably rejected defendant's claim that he had been unaware that his father's gun was in the car. Moreover, the court also reasonably rejected the testimony of defendant's father that he had spontaneously placed his gun, in its case, on the floor board of the sister's car. Moreover, defendant's father did not discover his gun was missing until he checked the case in his safe. Because defendant knew that he and his cohorts were going to see Buckingham, who usually had a gun on him, it is more than reasonable for the court to find that defendant took the gun with him.

The third *Banks* factor further supports that defendant was a major participant. Defendant was aware of the particular dangers posed by the nature of the crime, weapons used, or past experiences or conduct with other participants. As explained in detail *ante*, defendant was closely involved with the escalating violent and armed confrontations between Fava and Buckingham, and assisted in a plan to conduct an armed robbery and assault of Buckingham, a drug dealer who had already threatened to put a bullet in Fava's head. With these facts and circumstances, it was foreseeable that there was a high risk of violence, or even death. (See *In re McDowell* (2020) 45 Cal.App.5th 921, 932 [home invasion robbery of a drug dealer is a crime with a particularly high risk of violence].)

22

As to the final *Banks* factor, defendant was in a position to either restrain his cohorts or render aide; defendant did neither. Defendant's statements to the detective placed him near the trigger man. Defendant both testified and told the detective that he left Atencio as he laid on the ground. Although defendant was in a position to intervene, he neither restrained his cohorts nor rendered aide when the victims were injured.

Based on the foregoing we find that there is substantial evidence to support the trial court's finding that defendant was a major participant in the robbery/burglary.

b.        Defendant Acted With Reckless Disregard for Human Life

There was also substantial evidence that defendant acted with reckless indifference to human life. "Although we state these two requirements [major participation in the felony committed and reckless indifference to human life] separately, they often overlap. For example, we do not doubt that there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life. Moreover, even in cases where the fact that the defendant was a major participant in a felony did not suffice to establish reckless indifference, that fact would still often provide significant support for such a finding." (*Tison v. Arizona* (1987) 481 U.S. 137, 158, fn. 12.)

As explained in detail *ante*, the evidence of defendant's major participation was overwhelming and the evidence amply establishes reckless indifference to human life. For one, defendant was present when Atencio was murdered. "Presence at the scene of the murder is a particularly important aspect of the reckless indifference inquiry." (*People v. Garcia* (2020) 46 Cal.App.5th 123, 148.) It is even more so when it is evident

23

that defendant was aware the robbery could be highly volatile; his cohorts were armed and they knew that Buckingham, a drug dealer, would also be armed, and when defendant and his cohorts have had escalating interactions with Buckingham.

Moreover, defendant's actions during the robbery are telling. When the detective asked what defendant was doing while Buckingham was being attacked by Fava, defendant responded that he was "trying to look for things of value or whatever, ya know," and was "kinda lookin' in there to see if [Buckingham's] got any electronics or anything (inaudible)," and defendant "ya know, I couldn't really talk to the dude 'cause he was getting beat up and . . . ." When the detective asked defendant if he said anything to Buckingham, defendant responded: "Yeah, I asked him, uh, I asked him, ya know, where's your money and your drugs and ya know, something, um, he didn't answer or anything. I don't even know if he's hearing what I'm saying, ya know, um, and at some point in time [Lewis] ends up in the room, too, and now they're both beating [Buckingham] up . . . so I go back and I'm heading back toward the living room or whatever, to go wherever [Carr] is to make sure he's okay or whatever and that's when the gunshot just started going off."

In sum, as noted *ante*—defendant was a major participant in the crime of robbery/burglary. Moreover, defendant, while he observed Fava and Lewis beating up Buckingham, showed no concern for the victim. All defendant wanted to do was to try to find money or drugs. Thereafter, after he saw that Atencio got shot, he made no effort to offer the victim any aid. We find that there is substantial evidence to support the trial court's finding that defendant acted with reckless disregard for human life.

24

**DISPOSITION**

The order denying defendant's section 1170.95 petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                                        Acting P. J.

We concur:

CODRINGTON _____
                                J.

RAPHAEL _____
                                J.